IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| **CAMERON COUNTY HOUSING AUTHORITY and COMMUNITY HOUSING & ECONOMIC DEVELOPMENT CORPORATION,** | § § § § § | |
| Plaintiffs, | § § | |
| v. | § § § | **Civil Action No.** |
| **CITY OF PORT ISABEL, CITY OF PORT ISABEL CITY COMMISSION, and PORT ISABEL PLANNING AND ZONING COMMISSION,** | § § § § § § | |
| Defendants. | § | |

## PLAINTIFFS' ORIGINAL COMPLAINT

Plaintiffs Cameron County Housing Authority (the "Housing Authority") and Community Housing & Economic Development Corporation (the "CHEDC") (collectively, "Plaintiffs") hereby complain of Defendants City of Port Isabel, Port Isabel City Commission, and Port Isabel Planning and Zoning Commission (collectively, "Defendants"), and in support thereof, would respectfully show the Court as follows:

### I.

### PRELIMINARY STATEMENT

1. This lawsuit arises because Defendants egregiously sought to exploit disaster relief efforts for the wrongful purpose of promoting housing segregation in Port Isabel, Texas. Defendants' conduct constitutes a violation of federal law, and resulted in Plaintiffs suffering significant economic damages in December 2015, including the loss of federal disaster relief funds. More specifically, Defendants employed discriminatory efforts to prevent Plaintiffs from rebuilding a multi-family affordable housing development for low-income individuals and

families known as The Neptune Apartments, located at 407 Summit Street, Port Isabel, Texas 78578, which had been rendered uninhabitable by Hurricane Dolly.  Ultimately, in December 2015, the Housing Authority lost millions of dollars in federal grant funding simply because Defendants refused to authorize the necessary zoning changes and use permits based on the national origin and familial status of the tenants.  Plaintiffs were, therefore, unable to rebuild the complex, which had a profoundly disproportionate impact upon Latino residents of Port Isabel.

2. Plaintiffs expended significant time and effort in an attempt to rebuild the complex, and thereby provide an affordable housing opportunity for the low-income (primarily Latino) residents of Port Isabel.  Indeed, Plaintiffs went the extra mile to develop a plan that the community would support, engaging in extensive community engagement efforts.  Ultimately, however, it became clear that the real intent of the concerned Anglo residents was to prevent persons with Latino national origin or ancestry and families with children from returning to the neighborhood from which they had been displaced by Hurricane Dolly.

3. As part of Plaintiffs' community engagement efforts, during Summer 2015, Plaintiffs and/or its partners organized and conducted at least two community meetings with residents from the neighborhood surrounding the development site.  The purpose of this community engagement was to work cooperatively with the residents to create a design that all interested parties, including the neighborhood residents would support. Despite the fact that the population of Port Isabel and Cameron County is overwhelmingly Latino, the overwhelming majority of the residents who attended these meetings were Anglo, and all attendees at both meetings were vehemently opposed to *any* multi-family development being constructed on the site.

4. During these meetings, the Anglo residents also displayed their true motives, espousing classic examples of camouflaged discriminatory comments, such as not wanting

"those people" to come back, because the neighborhood had been "cleaned up," and multi-family residents would bring "drugs and crime" back to the neighborhood. Residents also made comments based on stereotypes about Latino persons including larger families sizes and loud celebrations, and comments about children being outside too often, indicating a bias against families with children.

5. In direct and explicit reference to the area residents' opposition, City officials acceded to the discrimination, expressing their support for the opponents, revealing their own discriminatory attitudes, and ultimately taking a series of impermissible actions intended to derail the project.

6. Defendants' actions were the result of intentional discriminatory conduct driven by animus against people with or perceived to have national origins other than the United States and families with children. In addition, Defendants' conduct had a profoundly disproportionate impact on persons of Latino national origin or ancestry, which make up 99% of the Housing Authority's residents and tenant waiting list, and families with children, which make up 74% of the Housing Authority's tenants and waiting list. Defendants' actions also have the purpose and effect of perpetuating segregation in the City of Port Isabel by denying families and individuals the right to live in a particular neighborhood based on their national origin and familial status.

7. Defendants' wrongful and discriminatory actions, which had the purpose and effect of disallowing, delaying, blocking, and otherwise interfering with the attempt by Plaintiffs to rebuild the Neptune Apartments constitutes a violation of federal fair housing laws. By this lawsuit, Plaintiffs seek redress for the significant harm suffered as a result of Defendants' unlawful conduct.

## II.

## PARTIES

8. Plaintiff Cameron County Housing Authority came into existence in 1977. The Housing Authority is composed of 320 public housing units, 1006 Section VIII and 177 conventional units. The Housing Authority's jurisdiction is from South Padre Island to La Feria, Texas in Cameron County. The Housing Authority's mission is to provide low-income families with safe, decent and affordable housing, and to promote programs that lead to economic self-sufficiency and enhance the quality of life of its resident families. The Housing Authority is committed to developing and implementing programs that will assist resident families to become self-sufficient, provide for supportive services and coordinate efforts with other agencies to address the needs of the community. Ninety-nine percent of the Housing Authority's tenant households are Hispanic/Latino, 70% are Extremely Low Income, 22% are Very Low Income, and 74% are families with children.

9. Plaintiff Community Housing & Economic Development Corporation is a public facility corporation created and owned by the Cameron Counting Housing Authority. The Neptune Apartment complex, which is the property underlying this dispute, is owned by the Community Housing & Economic Development Corporation.

10. Defendant City of Port Isabel is a municipal corporation located in Cameron County, Texas. The City of Port Isabel is organized under and operates by virtue of the rules of the State of Texas as a home rule unit of local government. The City of Port Isabel government is comprised of the Mayor, the City Commission, various subsidiary boards and commissions, the City Manager, and professional staff. The City of Port Isabel is the recipient of federal funds including Community Development Block Grant funds for Disaster Recovery related to Hurricane Dolly, other housing and community development funds from the U.S. Department of

Housing and Urban Development, and the Economic Development Administration (EDA). As a recipient of these and other federal funds, the City of Port Isabel is subject to Title VI of the Civil Rights Act of 1964, which prohibits discrimination on the basis of race, color, and national origin in programs and activities receiving federal financial assistance.

11.     Defendant City of Port Isabel Commission is comprised of the Mayor and four elected Commissioners, one of whom shall be designated as Commissioner No. l, one as Commissioner No. 2, one as Commissioner No. 3, and one as Commissioner No. 4. Whenever the City Commission shall have adopted a Master Plan recommended by the City Planning and Zoning Commission, no public buildings, streets, alleys, ways, viaducts, bridges, railroads, terminals, parks, parkways, playgrounds, aviation fields, athletic fields, school grounds, fire station sites or any other public grounds or public improvements, or parts thereof, shall be constructed until and unless the location shall be recommended by the City Planning and Zoning Commission, and approved by the City Commission; provided, however, that in case of its disapproval, the City Planning and Zoning Commission shall communicate its reason for disapproval to the City Commission and thereupon, by majority vote of the City Commission, it shall have the power of overruling the disapproval.

12.     Defendant Port Isabel City Planning and Zoning Commission is comprised of seven members, all of whom must be residents of the City of Port Isabel. The members are appointed by the City Commission. The Mayor and each Commissioner each recommend one Board member, which recommendations must be approved by the City Commission. Each of these five Planning and Zoning Board members are identified by City Commissioner position, and each Board member's turn coincides with the terms of the Mayor or Commissioner who recommends the Board member. The other two members of the Planning and Zoning Board are chosen at large by a majority vote of the City Commission. The function and duty of the City

Planning and Zoning Commission is to make, or cause to be made, and adopt a Master Plan for the physical development of the city, subject to approval by the City Commission. Port Isabel Code of Ordinances § 32.019. If the Planning and Zoning Commission recommends against a proposed variance, zoning change or special use request, or if 20% of the property owners within 200 feet of the site in question file a letter of protest, the request may be approved and passed by the City Commission only upon a two-thirds vote in favor of the proposed request. *Id.* § 160.236.

### III.

### JURISDICTION AND VENUE

13. This Court has jurisdiction over this matter under 28 U.S.C. §§ 1331, 1343(a)(3), 2201, and 2202, and 42 U.S.C. § 3613(a).

### IV.

### RELEVANT FACTUAL BACKGROUND

**A. After Hurricane Dolly Irreparably Damaged the Neptune Apartment Complex, the Housing Authority Was Awarded Community Development Block Grant for Disaster Recovery Funds to Rebuild.**

14. In July 2008, Hurricane Dolly struck the Rio Grande Valley in South Texas, rendering the 16-unit multifamily Neptune Apartments uninhabitable. The Neptune Apartment complex was owned by Plaintiff CHEDC, and operated by Plaintiff CCHA.

15. The Housing Authority was awarded CDBG-DR funding through the Lower Rio Grande Valley Development Council (the "LRGVDC") to rebuild Neptune Apartments as a 26-unit mixed income development in April 2014. The City of Port Isabel initially supported the Housing Authority's planned redevelopment of the Neptune Apartments because of the severe shortage of affordable housing in Port Isabel, particularly for people who work in the City, the success of similar developments in other cities, and the way the design fit into the neighborhood.

**B.     Plaintiffs' Redevelopment of the Neptune Apartments Would Have Involved Latino Residents Returning to a Highly Anglo Neighborhood.**

16.     Port Isabel is a tourist destination located in Cameron County, Texas, on an estuary of the Gulf of Mexico, across from South Padre Island.

17.     The population of both the Lower Rio Grande River Valley, and Cameron County, are overwhelmingly Latino.  The City of Port Isabel has a significantly lower percentage of Latino residents than the county as a whole, and there is a far greater percentage of non-Latino Whites in Port Isabel than the surrounding areas. While Cameron County is 88.5% Latino and 10.1% Non-Hispanic White, Port Isabel is 74.0% Latino and 23.4% Non-Hispanic White, with the Latino population concentrated in specific areas of the City. (2015 ACS)

18.     Perhaps more importantly for purposes of this lawsuit, the immediate neighborhood surrounding the Neptune Apartment site is significantly more affluent and Anglo than the surrounding areas.  The Neptune Apartments site is located in Census Tract 123.01, which has a Median Family Income (MFI) of $59,766, over $27,000 higher than the MFI for Cameron County ($32,000).  Indeed, in stark contrast to the surrounding areas, the area immediately surrounding the Neptune site is majority Anglo.  Based on the U.S. Census Bureau, 2011-2015 American Community Survey 5-year Estimates, 64% of the 623 residents in the neighborhood surrounding the Neptune Apartment site are non-Hispanic White.

19.     Historically, affordable housing in Port Isabel has been primarily concentrated in an area further inland from the Neptune Apartments, on the other side of Highway 100.  This area has historically been referred to as "Little Mexico," and is located in close proximity to industrial sites.  The Neptune Apartment site, by contrast, is located on a desirable location overlooking Laguna Madre – a beautiful bay.

20.     During the process, which ultimately resulted in Plaintiffs being denied the ability to receive the federal funds, or redevelop the Neptune Apartments, comments were made by

members of the community and public officials suggesting that affordable housing should be limited to the area known as "Little Mexico."

## C. Vehement Anglo Opposition To The Neptune Re-Development Erupts.

21. The Neptune Apartments are located on three and four fifths lots between on Summit Street, and CHEDC owns an additional lot across the street from the Neptune site. Two of these lots are zoned A-1 Multifamily, two lots are zoned R-1 Single Family Residential, and the lot across the street is zoned R-2 Duplex/Fourplex Residential. The Neptune site is bordered by a motel on one side and single-family homes on the other. The surrounding blocks are a mix of A-1, R-1, and R-2 zoning. Because the original plans for the redevelopment project included constructing multi-family units on the lots zoned for single-family use, it was necessary for the Port Isabel Planning and Zoning Commission to approve re-zoning the site in order for the project to proceed. On March 11, 2015, during a Planning and Zoning Commission (the "P&Z Commission") meeting to approve rezoning and replatting necessary for the proposed mixed-income development, it became apparent that there was public opposition to the project.

22. Approximately twenty members of the public, overwhelmingly Anglo, appeared at the March 11, 2015 public hearing to oppose the rezoning request. Public testimony in opposition to rebuilding was based on camouflaged racial expressions and discriminatory statements about property value declining, concerns that the tenants would be the same "type of tenants" as public housing, and concerns that the units would be "Section 8" housing. Commission Members made similarly biased statements.

23. The City Secretary also received five written comments from neighborhood residents opposing the rebuilding for reasons including, "multifamily housing would change [the neighborhood] – for the worse"; assertions both that the neighborhood was predominantly single-

family and that there was already too much multifamily housing; and requests to "make it something nice."

24. One member of the Commission stated that the Housing Authority should purchase property on the other side of Highway 100 where other public and affordable housing is located. The other side of Highway 100 is lower-income, closer to the port and industrial uses, is the location of all other public housing, and was historically referred to as "Little Mexico." The P&Z Commission voted unanimously to deny replatting and rezoning for the Neptune Apartments.

25. Thereafter, the Housing Authority engaged Community Development Corporation at Brownsville ("CDCB") to assist with the development of the project. CDCB also partnered with buildingcommunityWORKSHOP ("[bc] Workshop"), a nonprofit community design center, which focuses on bringing design thinking to underserved communities. [bc] Workshop has tremendous expertise and experience in community engagement efforts, and a proven track record in forming strong relationships through collaborative design work and educational outreach activities. Part of [bc] Workshop's mission is the recognition that it must first understand the social, economic, and environmental issues facing a community before beginning work.

26. During Summer 2015, the Housing Authority and [bc] Workshop set out on an ambitious community engagement effort, which included, among other things, going door-to-door through the neighborhood and handing out flyers, meeting with residents and community officials, and organizing community meetings. Throughout the course of this community engagement, discriminatory statements and camouflaged racial expressions were made by members of the public, including:

- Statements that "those people" should not be living in this neighborhood.

- Statements that public housing residents did not deserve to live near the bay because other residents "worked harder."

- Allegations that the development would cause "overcrowding" because large families would reside in one apartment.

- Allegations that the potential residents were lazy and criminal.

- Allegations that there would be overcrowding in the apartments and "you people probably want to bring your grandma" based on stereotypes about Latino families.

- Statements that residents did not want children living in the units and allegations that units would be occupied by "a single mom with eight kids."

27. CDCB and [bc] Workshop spent a significant amount of time and money in their community engagement efforts, conducting at least two community meetings with residents from the neighborhood surrounding the development site.

28. Despite the fact that the population of Port Isabel and Cameron County is overwhelmingly Latino, the majority of the residents who attended these meetings were Anglo, and all attendees at both meetings were vehemently opposed to *any* multi-family development being constructed on the site.

29. During these meetings, the Anglo residents also displayed their true motives, espousing classic examples of camouflaged discriminatory comments, such as not wanting "those people" to come back, because the neighborhood had been "cleaned up," and multi-family residents would bring "drugs and crime" back to the neighborhood.

**D. Racial Tensions Were So High That When a Second P&Z Commission Meeting Was Scheduled to Consider the Re-Development, the Housing Authority Was Asked Not to Attend – And The Meeting Was Subsequently Canceled.**

30. Plaintiffs attempted repeatedly to respond to issues raised by the P&Z Commission and the public, including reducing units on the site and changing the plan from a single building to "cottage style" units. A second Public Hearing and Regular Meeting of the

Planning and Zoning Commission on the Housing Authority's request to replat and rezone the Neptune site for the new proposal was scheduled for Wednesday, June 10, 2015.

31. By the time this second meeting was scheduled, however, racial tensions surrounding the redevelopment of the Neptune site had reached a fever pitch. City Manager, Jared Hockema, called Daisy Flores, the Executive Director of the Housing Authority, and requested that she not attend the meeting because it would be "explosive and embarrassing."

32. Ms. Flores asked if attending the meeting would put her or her staff at risk of physical harm, and the City Manager's only response was – "just don't come." The Housing Authority pulled the item at Mr. Hockema's request and out of concern for the safety of the Housing Authority's staff.

33. Thereafter, the P&Z Commission officially canceled the June 10 meeting. It is unclear if the P&Z Commission ever reported its denial of Plaintiffs' requests to the City Commission as required by law, but there is no record of the City Commission ever considering issues related to the re-development of the Neptune Apartments.

E. **Even After the Housing Authority Substantially Whittled Down the Plan—To The Point That Re-Zoning Was No Longer Even Necessary—The City Denied the Plan Outright.**

34. In July 2015, the Housing Authority again revised its plan for the Neptune rebuilding project, maintaining the reduced number of units and splitting the units between several sites on the same street. This proposal would not have required rezoning, only review by the Planning and Zoning Commission and permitting from the City. After two community planning meetings held on the new proposal, the Housing Authority revised the proposal in accordance with community feedback, eliminating any multifamily building and proposing all units as single family or duplex. In September 2015, the Housing Authority met with members of City Council and the Mayor and were told that the City would not issue permits for the

rebuilding unless the Housing Authority reduced the number of units to 10, although the City had previously told the Housing Authority that there would be no problem with permits for the 16 unit plan.

35. The Housing Authority submitted the applications for permitting for 10 units – four single-family homes and six units in a multifamily building – to the Port Isabel building inspector on October 28, 2015. On November 10, 2015, the Housing Authority met, after business hours, with building inspector Larry Ellis, City Manager Jared Hockema, and Mayor Joe Vega and were told that the City of Port Isabel would not permit multifamily buildings (on a site zoned multifamily) and would not permit more than four units. Eliminating the six units in the multifamily building would have eliminated the affordable units set aside for the lowest-income families in the planned redevelopment. The Housing Authority submitted plat amendments for four single-family homes on November 13, 2015.

36. The Housing Authority asked for LRGVDC approval of a further reduction in units. On November 24, 2015, LRGVDC sent a letter to the Housing Authority informing the Housing Authority that their request to reduce the number of units to four was being refused and asking if the Housing Authority would be able to close on and permit ten units by December 1, 2015. On November 25, 2016, the Housing Authority sent a letter to LRGVDC informing the COG that they would be unable to close on the 10 single-family units the COG had approved because the City of Port Isabel, "has indicated that they will only approve building permits for four single family homes."

## V.

## CONDITIONS PRECEDENT

37. All conditions precedent to Plaintiffs' recovery have occurred or have been waiver or excused.

## VI.

## CAUSES OF ACTION

A. **First Cause of Action: Fair Housing Act, 42 U.S.C. § 3604(a)**

38. Plaintiffs reallege and incorporate the facts and allegations contained in the foregoing paragraphs as fully set forth herein.

39. Defendants, through their actions and the actions of their agents, are liable for the violation of Plaintiffs' rights under the federal Fair Housing Act, 42 U.S.C. § 3604(a).

B. **Second Cause of Action: Fair Housing Act, 42 U.S.C. § 3604(b)**

40. Plaintiffs reallege and incorporate the facts and allegations contained in the foregoing paragraphs as fully set forth herein.

41. Defendants, through their actions and the actions of their agents, are liable for the violation of Plaintiffs' rights under the federal Fair Housing Act, 42 U.S.C. § 3604(b).

C. **Third Cause of Action: Fair Housing Act, 42 U.S.C. § 3604(c)**

42. Plaintiffs reallege and incorporate the facts and allegations contained in the foregoing paragraphs as fully set forth herein.

43. Defendants, through their actions and the actions of their agents, are liable for the violation of Plaintiffs' rights under the federal Fair Housing Act, 42 U.S.C. § 3604(c).

D. **Fourth Cause of Action: Fair Housing Act, 42 U.S.C. § 3604(f)**

44. Plaintiffs reallege and incorporate the facts and allegations contained in the foregoing paragraphs as fully set forth herein.

45. Defendants, through their actions and the actions of their agents, are liable for the violation of Plaintiffs' rights under the federal Fair Housing Act, 42 U.S.C. § 3604(f).

E.    **Fifth Cause of Action: Fair Housing Act, 42 U.S.C. § 3617**

46.   Plaintiffs reallege and incorporate the facts and allegations contained in the foregoing paragraphs as fully set forth herein.

47.   Defendants, through their actions and the actions of their agents, are liable for the violation of Plaintiffs' rights under the federal Fair Housing Act, 42 U.S.C. § 3617.

F.    **Sixth Cause of Action: Title VI of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000d *et seq.* Against Defendant City of Port Isabel Only**

48.   Plaintiffs reallege and incorporate the facts and allegations contained in the foregoing paragraphs as fully set forth herein.

49.   Defendants, through their actions and the actions of their agents, are liable for the violation of Plaintiffs' rights under Title VI of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000d *et seq.*, under which, "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."

G.    **Seventh Cause of Action: Violation of 42 U.S.C. § 1981**

50.   Plaintiffs reallege and incorporate the facts and allegations contained in the foregoing paragraphs as fully set forth herein.

51.   Defendants' actions deny minority citizens the same rights as are enjoyed by white residents to make and enforce contracts in violation of 42 U.S.C. § 1981.

H.    **Eighth Cause of Action: Violation of 42 U.S.C. § 1982**

52.   Plaintiffs reallege and incorporate the facts and allegations contained in the foregoing paragraphs as fully set forth herein.

53.   Defendants' actions deny minority citizens the same rights as are enjoyed by white residents to lease, hold and otherwise enjoy real property in violation of 42 U.S.C. § 1982.

**I.     Ninth Cause of Action:   Violation of 42 U.S.C. § 1983 and the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution**

54. Plaintiffs reallege and incorporate the facts and allegations contained in the foregoing paragraphs as fully set forth herein.

55. Defendants' discriminatory actions deny minority citizens equal protection of the law by discriminating on the basis of race and national origin in the leasing of real property, in violation of 42 U.S.C. § 1983.

## VII.

## DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs demand a trial by jury of all issues in this case.

## VIII.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs pray that this Court:

a. Enter a declaratory judgment that the actions of Defendants are in violation of the Fair Housing Act of 1968, as amended, 42 U.S.C. § 3601 *et seq.*; Title VI of the Civil Rights Act of 1964; and the Equal Protection Claus of the U.S. Constitution and 42 U.S.C. § 1983;

b. Issue a permanent injunction restraining Defendants, their agents, employees, representatives, or any other person acting directly or indirectly with them from unlawfully interfering with Plaintiffs' developments, and directing Defendants to take all affirmative steps necessary to remedy the effects of the illegal, discriminatory conduct described herein and to prevent similar occurrences in the future;

c. Award compensatory damages in an amount to be determined by the jury that would fully compensate Plaintiffs for the loss that has been caused by the conduct of Defendants alleged herein;

        d.      Award punitive damages to Plaintiffs in an amount to be determined by the jury that would punish Defendants for their willful, wanton, and reckless conduct alleged herein and that would effectively deter Defendants from engaging in similar conduct in the future;

        e.      Award Plaintiffs its reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 3613(c)(2); and

        f.      Order such relief as this Court deems just and equitable.

Respectfully submitted,

**BELL NUNNALLY & MARTIN LLP**

By: */s/ Benjamin L. Riemer*
    Benjamin L. Riemer
    Attorney-in-Charge
    Texas Bar No. 24065976
    Southern District No. 1146374
    briemer@bellnunnally.com

1400 One McKinney Plaza
3232 McKinney Avenue
Dallas, Texas 75204-2429
Telephone: (214) 740-1400
Telecopier: (214) 740-1499

and

**TEXAS APPLESEED**

Melissa Madison Sloan
Of Counsel
Texas Bar No. 24049374
Southern District No. (*pending pro hac vice admission*)
msloan@texasappleseed.net

1609 Shoal Creek Blvd., Ste. 201
Austin, Texas 78701-1022
Telephone: (512) 473-2800

**ATTORNEYS FOR PLAINTIFFS**

3597492_4.docx / 10808.3